NO. 12-03-00064-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


§
 APPEAL FROM THE 392ND

IN THE INTEREST

§
 JUDICIAL DISTRICT COURT OF

OF A.B., A CHILD

§
 HENDERSON COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellant Kathryn Barker ("Kathryn") appeals the termination of her parental rights. 
Kathryn presents four issues on appeal. We affirm.


Background

 Kathryn and Joey Leonard Barker ("Joey") are the parents of A.B., born on February 26,
1998. The couple never married. When A.B. was approximately eighteen months old, Kathryn
married Donald Eugene Barker, Jr. ("Donald"), Joey's brother. On November 16, 2001, Appellee,
the Texas Department of Protective and Regulatory Services (the "Department"), received an intake
call alleging physical abuse of A.B. According to an affidavit filed by Katherine Diesch ("Diesch")
of the Department, A.B. allegedly suffered a dog bite, and Donald took him to a hospital emergency
room. The intake caller stated that the bite was human, and reported that, upon further questioning,
Donald left the emergency room with A.B. After the Department located A.B., he and Kathryn were
transported to the hospital. Diesch reported that A.B.'s injuries were more extensive than reported
by the intake caller earlier in the day. When questioned about the day's events, Kathryn's answers
were inconsistent and evasive. Further, Diesch stated that Kathryn's behavior was "bizarre," that
Kathryn admitted using Valium and methamphetamines intravenously, and that Kathryn appeared
intoxicated. Thereafter, the Department filed an original petition for protection of A.B., for
conservatorship, and for termination of Kathryn's and Joey's parental rights to A.B. 

 Kathryn divorced Donald in December 2002. After a jury trial on termination in December
2002 ended in a mistrial, Joey relinquished his parental rights to A.B. In January 2003, the trial court
ordered termination of the parent-child relationship between Joey and A.B. Kathryn's termination
proceeding was tried before the court. At trial, Kathryn stipulated that she (1) knowingly placed or
knowingly allowed A.B. to remain in conditions or surroundings which endangered his physical or
emotional well-being and (2) engaged in conduct or knowingly placed A.B. with persons who
engaged in conduct which endangered his physical or emotional well-being. Thus, the only issue
before the trial court was whether termination of Kathryn's parental rights is in A.B.'s best interest. 

 After examining and hearing all of the evidence, the judge found by clear and convincing
evidence that termination of Kathryn's parental rights is in the best interest of A.B. On February 3,
2003, the court signed an order terminating the parent-child relationship between Kathryn and A.B.
This appeal followed.


Termination of Parental Rights

 Involuntary termination of parental rights embodies fundamental constitutional rights. Vela
v. Marywood, 17 S.W.3d 750, 759 (Tex. App.-Austin 2000), pet. denied per curiam, 53 S.W.3d 684
(Tex. 2001); In re J.J., 911 S.W.2d 437, 439 (Tex. App.-Texarkana 1995, writ denied). Because
a termination action is complete, final, and irrevocable, the proceedings must be strictly scrutinized. 
Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re Shaw, 966 S.W.2d 174, 179 (Tex.
App.-El Paso 1998, no pet.). 

 Section 161.001 of the Family Code permits a court to order termination of parental rights
if two elements are established. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.M.T., 39
S.W.3d 234, 237 (Tex. App.-Waco 1999, no pet.), disapproved on other grounds, 96 S.W.3d 256,
267 & n.39 (Tex. 2002). First, the parent must have engaged in any one of the acts or omissions
itemized in the first subsection of the statute. Tex. Fam. Code Ann. § 161.001(1) (Vernon 2002);
Green v. Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 213, 219 (Tex. App.-El Paso
2000, no pet.); In re J.M.T., 39 S.W.3d at 237. Second, termination must be in the best interest of
the child. Tex. Fam. Code Ann. § 161.001(2) (Vernon 2002); In re J.M.T., 39 S.W.3d at 237.
Additionally, both elements must be established by clear and convincing evidence, and proof of one
element does not alleviate the petitioner's burden of proving the other. Tex. Fam. Code Ann.
§ 161.001; Wiley, 543 S.W.2d at 351; In re J.M.T., 39 S.W.3d at 237. There is a strong
presumption that the best interest of the child is served by preserving the parent-child relationship. 
Wiley, 543 S.W.2d at 352; In re J.M.T., 39 S.W.3d at 240. Thus, the burden of proof is upon the
person seeking to deprive the parent of her parental rights. In re J.M.T., 39 S.W.3d at 240.


Best Interest of the Child

 On appeal, Kathryn challenges the trial court's finding that termination is in A.B.'s best
interest. In determining the best interest of the child, a number of factors have been considered
including (1) the desires of the child; (2) the emotional and physical needs of the child now and in
the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental
abilities of the individuals seeking custody; (5) the programs available to assist these individuals;
(6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions
of the parent which may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72
(Tex. 1976).

 This list is not exhaustive, but simply indicates considerations which have been or could be
pertinent. Id. However, the best interest of the child does not require proof of any unique set of
factors nor limit proof to any specific factors. In re D.M., 58 S.W.3d 801, 814 (Tex. App.-Fort
Worth 2001, no pet.). The Holley test focuses on the best interest of the child, not the parent's best
interest. Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex.
App.-Dallas 1995, no writ). 


Sufficiency of the Evidence

 In her first issue, Kathryn contends that the evidence is legally and factually insufficient to
support the trial court's finding.


Standard of Review

 Due process requires a petitioner to justify termination by clear and convincing evidence
because termination is such a drastic remedy. In re J.M.T., 39 S.W.3d at 237. The clear and
convincing standard for termination of parental rights is both constitutionally and statutorily
mandated. Tex. Fam. Code Ann. § 161.001; In re J.J., 911 S.W.2d at 439. Clear and convincing
evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code
Ann. § 101.007 (Vernon 2002). 

 When confronted by both a legal and factual sufficiency challenge, an appellate court must
first review the legal sufficiency of the evidence. Glover v. Texas Gen. Indem. Co., 619 S.W.2d
400, 401 (Tex. 1981); In re M.D.S., 1 S.W.3d 190, 197 (Tex. App.-Amarillo 1999, no pet.). In
conducting a legal sufficiency review, we must look at all the evidence in the light most favorable
to the findings to determine whether a reasonable trier of fact could have formed a firm belief or
conviction that its findings were true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must
assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder
could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found
incredible. Id. This does not mean that we are required to ignore all evidence not supporting the
finding because that might bias a clear and convincing analysis. Id. If we determine that no
reasonable fact finder could form a firm belief or conviction that the matter that must be proven is
true, we must conclude that the evidence is legally insufficient and render judgment in favor of the
parent. Id.

 The appropriate standard for reviewing a factual sufficiency challenge to the termination
findings is whether the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner's allegations. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). 
In determining whether the fact finder has met this standard, we consider all the evidence in the
record, both that in support of and contrary to the trial court's findings. Id. at 27-29. Further, we
must consider whether disputed evidence is such that a reasonable fact finder could not have
reconciled that disputed evidence in favor of its findings. In re J.F.C., 96 S.W.3d at 266. If the
disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief
or conviction, then the evidence is factually insufficient. Id. We use the Holley factors as a guide
in conducting our review.

The desires of the child

 Kelly Smith ("Smith"), a licensed counselor, began weekly therapy with A.B., ten days after
he was placed in Child Protective Services ("CPS") custody. According to Smith, the videotape of
a visitation between A.B. and Kathryn showed that A.B. seemed to maintain a distance from
Kathryn, and that, when A.B. left, he kissed Kathryn, but did not linger. After the visit, A.B.
commented to Smith that, "[s]he's mean and I'm sorry to mama." When asked why he was sorry,
A.B. stated that he wanted to stay with Smith. In a subsequent session, A.B. asked Kathryn's
caseworker in the waiting room if his mother was visiting and she told him that his mother was
working. After entering the room for his session, A.B. took a play telephone, had Smith pretend to
call Kathryn, and told her, "don't come here," or "I don't want you here."

 Dr. Mary Connell ("Connell"), a clinical and forensic psychologist, evaluated A.B. in
November of 2002. She testified that A.B. seemed to "revel" in Kathryn's attention, and was
delighted in their conversation. A.B. wanted to know Kathryn, asked questions about her, glowed
in her presence, and was "extremely reluctant" to end the visits. From her observations, Connell
assumed that A.B. wants to be with Kathryn. At the visit she personally observed, A.B. asked
Kathryn if they could go to her house.

The emotional and physical needs of the child now and in the future

 Dr. Sandy Harper ("Harper"), a licensed psychologist, conducted a psychological evaluation
of A.B. in March 2002 when he was four years old. Harper observed that A.B. was a very
emotionally-charged and, at times, disturbed child. During the evaluation, A.B. had problems
controlling his temper and finishing sentences, was very fidgety, anxious, easily frustrated and upset,
and threw fits. A.B. did not appear properly socialized and did not fit within the average realm of
social interactiveness. A.B.'s foster mother, Mary Katherine Seeley ("Seeley"), reported that A.B.
made numerous threats and statements about wanting to hurt others. Further, Harper stated that, in
reports provided to her, A.B. demonstrated problems with sexual preoccupation, aggressiveness, and
inappropriate sexual behaviors.

 Harper gave A.B. an early childhood assessment test to determine "total protective factors,"
or characteristics of resilient children. Based upon the test results, Harper opined that A.B. requires
a very stable, very predictable environment in the future because he is a very vulnerable, damaged
child, emotionally and behaviorally. In fact, Harper stated A.B. is about as vulnerable as a child can
be, in the one percentile compared to other children. In order to have a healthy and productive life,
A.B. needs a safe environment and continued help, including possible therapy. Harper could not rule
out future diagnoses of post-traumatic stress disorder, reactive attachment disorder, or depressed
disorder because A.B. had much of the symptomology.

 Smith's beginning diagnoses were abuse of a child, emotional disturbance of childhood, and
conduct disturbance with rage based on A.B.'s history and Smith's observations. In the beginning,
A.B.'s behavior was extremely aggressive and violent, he had difficulty controlling his behavior and
following directives, and he acted out sexually. According to Smith, some of A.B.'s early behavior
is explained by his removal from his home. Smith also believes A.B. needs continued therapy and
that his fear of abandonment is generalized. Smith opined that A.B. suffers from post-traumatic
stress disorder.

 Connell evaluated A.B. in November 2002, and her findings essentially parallel Harper's.
Connell acknowledges that A.B. has improved since being in CPS custody because he is no longer
using inappropriate foul and sexual language, his fear of baths has subsided, and his sexual play has
decreased. These behaviors could have been linked to the trauma of the removal, his developmental
level, and his attempts to self-stimulate or self-soothe. She does not know if A.B.'s sexual
knowledge was from exposure. A.B.'s feelings of abandonment may have come from his long
separation from his mother. According to Connell, A.B.'s vulnerability does not suggest that he
needs special parenting beyond what Kathryn is capable of giving him. 

The emotional and physical danger to the child now and in the future

 Harper opined that, without a safe environment in the future, A.B. could develop conduct
disorders, including full-blown oppositional defiant disorders. Harper stated that, according to her
limited knowledge about treatment of persons with drug and alcohol abuse, only ten percent recover
during the first year. The predictability of such a parent is a major concern, and Harper does not
believe that A.B. can successfully endure another traumatic event. Thus, in her opinion, A.B. should
be in foster care or adopted. Harper admitted that A.B.'s stability could be compromised if he is
removed from his foster family and returned to his mother, or if his relationship with his mother is
terminated. 

 Smith believes that there would be a definite risk to A.B. if he were returned to Kathryn.
Specifically, she testified that returning A.B. to the environment and the care of persons he was with
before his removal could retraumatize him and set him back emotionally and behaviorally. Based
on her observations and conversations with A.B., Smith believed A.B. would sustain more than a
reasonable degree of risk of instability if he were returned to Kathryn. Bonnie McBride
("McBride"), a psychotherapist, had treated Kathryn approximately three times per month since
January 11, 2002. McBride acknowledged that there was a risk involved in returning A.B. to
Kathryn's care. Dr. Michael Flynn ("Flynn") is a forensic psychologist. In May and September of
2002, he conducted two interviews with Kathryn and completed a psychological evaluation. 
According to Flynn, the risk to A.B. if he is returned to Kathryn is relatively manageable and well
within the reasonable limits.

 Connell admitted that, if Kathryn were to relapse, it would have a disastrous effect on A.B.
According to Connell, there was reason to suspect neglect based on his skills and behaviors upon
entering foster care. Connell could not link Kathryn's drug use and A.B.'s emotional disturbance,
although common sense suggested a negative effect. Returning him to Kathryn would decrease some
of his vulnerability, but could result in a broken attachment with the foster parents. Connell stated
there is a strong possibility that the trauma of removal effected A.B.'s sense of anxiety, frustration,
and abandonment. Connell denied that, because Kathryn is a drug addict, she possesses, ipso facto,
more than a reasonable degree of risk to the child. Connell described Kathryn's risk, within the
parameters of normative behavior, as at the bottom end of the spectrum of reasonable risk because
she had been an addict. Connell gave considerable weight to Kathryn's performance in the past year,
and her periods of stability. According to Connell, Kathryn has protective factors that reduced her
risk, including a steady work history. Connell sees no evidence that Kathryn would be inclined to
put her needs in front of her child's.

The parental abilities of the individual seeking custody

 Harper's impression of the environment provided by A.B.'s foster mother, Seeley, was that
she was doing her best to provide a safe and stable environment. Kathryn actively participated in
Child Protective Services ("CPS") family service plan and completed all of the services, except for
the ongoing counseling process. Smith observed A.B. with Kathryn once and, based on that
observation and behavior reported by the foster parents, recommended that no further visitation take
place. A.B. struck Kathryn in the breasts several times, which was not normative behavior.
According to Smith, this behavior indicated anger and aggression toward Kathryn.

 Dr. Paul Andrews ("Andrews"), a clinical psychologist, conducted a psychological evaluation
of Kathryn in January of 2002. Kathryn reported a history of substance abuse and remission. 
Kathryn showed no more than a normal risk for abusive parenting, although one subscale was
elevated to a clinically significant level. This subscale is associated with an awareness or recognition
of either the child or adult having problems or handicaps. A parenting inventory test indicated
average or better than average knowledge of attitudes and information usually associated with good
parenting. However, Kathryn has some personality characteristics not consistent with good
parenting, including features of antisocial personality disorder. These features include a failure to
conform with social norms and behavior based on her history of drug use, impulsivity and failure
to plan ahead, irritability and aggressiveness, disregard for the safety of others, and a lack of remorse
or indifference towards her affect on others. Kathryn's features do not create an environment
conducive to good child rearing. Andrews did not diagnose Kathryn with this disorder because she
did not meet a necessary preexisting condition. Kathryn reported two suicide attempts in July and
November of 2001, while in possession of A.B. 

 Andrews's only evaluation of Kathryn was over a year before the trial. At that time, Andrews
believed that A.B. was at risk for neglect, if not abuse, because Kathryn's antisocial traits were
evidenced in her behavior. He stated that there was a very high "connubiality" with antisocial
personality disorder and substance abuse. He believes that Kathryn is at a high, or at least moderate,
risk for relapse for the rest of her life. In his opinion, Kathryn "probably" possesses more than a
reasonable risk of instability.

 Kathryn scored well on tests for parenting knowledge and attitudes. Further, she has a solid
work history and higher education that indicate consistency, motivation, and an appreciation for
setting and striving for goals. Andrews opined that features of an antisocial personality disorder
could be addressed in treatment. If Kathryn makes progress and remains in treatment, Andrews
believes the risk of returning A.B. to her will be lower and, with monitoring, might be worth trying.

 Flynn's evaluation of Kathryn was not inconsistent with the findings of Andrews that
Kathryn had some features of antisocial personality disorder. In the past, Kathryn had relationships
with men who abused drugs and alcohol and who had criminal histories. In Flynn's opinion, Kathryn
is "certainly capable of providing perfectly good care" and stability for A.B. He also believes that
Kathryn wants to parent A.B. and loves him. He testified that any evidence of physical or sexual
abuse is not compelling to Flynn because, at that time, Donald, Kathryn, and A.B. were living in a
very chaotic situation. 

 According to Flynn, Kathryn has had periods of stability punctuated by episodes of drug and
alcohol abuse. She suffered relapses in 1990 and 2000. Before her relapse in 2000, Kathryn's life
was "kind of coming apart." Flynn stated that Kathryn's progress is "about as good as you could ask
for." He is optimistic because Kathryn has maintained her sobriety for over a year, has been through
treatment, and has cooperated with the Department. He considers Kathryn's age is a good prognostic
factor as well. 

 Connell interviewed and assessed Kathryn, focusing on parenting issues. She stated that
Kathryn is a remarkably good CPS client because she has cooperated with CPS and treatment
providers, aggressively pursuing her treatment plan, and maintained visitation with A.B. Kathryn
has an excellent support system in her church, friends, and twelve-step program. In fact, Kathryn's
social skills are a protective factor and lower her risk for failure. Connell believes that there is not
more than a reasonable risk that Kathryn will relapse. Kathryn might have a better chance of
sobriety because of her age, experience with relapse, and improved selection of partners or friends. 
Connell acknowledged that, because of Kathryn's drug addiction, she poses a greater risk to A.B.
Moreover, Kathryn has taken no responsibility for A.B.'s emotional disturbance. 

 McBride testified that Kathryn's past behavior was erratic, including two addiction relapses.
She is concerned about Kathryn's ability to parent based on her lack of judgment in choosing safe
relationships, her lack of family support besides church, and maintenance of her recovery program
and continued sobriety. She testified that Kathryn's judgment is improving, but that Kathryn may
see drug use as a shortcut. Kathryn had been violent while under the influence of drugs and alcohol,
and had the potential for violence if she abused drugs or alcohol. Kathryn made some lifestyle
changes that may be permanent including maintaining employment, attending Alcoholics
Anonymous, and participating in church, but needs continued counseling.

 Kathryn told McBride that she had stopped reading Donald's letters, visiting him, and
participating in the inmate support group. However, McBride discovered that Kathryn had been
visiting Donald occasionally. Kathryn is in denial about her relationship with Donald. Kathryn
admitted to McBride that she neglected A.B. when abusing drugs and alcohol. Kathryn takes no
responsibility for any actions that could have led to A.B.'s behavioral and emotional problems, other
than admitting she chose an inappropriate caregiver. Further, Kathryn has difficulty accepting that
Donald's or Joey's actions could have caused A.B.'s problems. McBride is concerned about
Kathryn's past relationship with men, including marriages to two men with addictive personalities,
antisocial behaviors, and criminal histories.

 Jeanette Zimmerman ("Zimmerman") is a CPS supervisor. She testified that, according to
Kathryn's therapist, Kathryn has not progressed enough to have her child returned. Completion of
a service plan is not always tantamount to reunification because the trauma to the child could be so
massive that a return would be trauma. Smith told Zimmerman that A.B. was traumatized in the
home, possibly sexually and physically abused, and neglected.

The plans for the child

 Seeley testified that if Kathryn's parental rights were terminated, she and her husband want
to adopt A.B. She stated that she loves A.B. and that they have developed a strong bond with A.B. 
Vicki Sussen ("Sussen"), a CASA supervisor, testified that, if A.B. were adopted, he would have two
parents, stability, and nurturing. 

The programs available to assist the individual seeking custody

 Kathryn's counseling is ongoing, she is involved with a church, and completed a recovery
program for her alcohol and drug abuse. She also completed CPS's family service plan.

The stability of the home

 Smith testified that A.B. had sustained severe damage in his home with Kathryn and Donald. 
Flynn admitted that Donald, Kathryn, and A.B. were living in a very chaotic situation before the
incident in November of 2001. Kathryn had a history of drug and alcohol abuse with two relapses
and two suicide attempts. According to McBride, Kathryn is in denial about her relationship with
Donald, and refuses to admit that she, Donald, and Joey could have been responsible for A.B.'s
emotional problems. McBride believes Kathryn has the skills to support herself. Zimmerman stated
that the Seeleys offered stability and predictability. Susan Dodd ("Dodd"), a CPS conservatorship
worker, made a home visit to Kathryn. She testified that Kathryn has a two-bedroom apartment and
that her living arrangements are suitable.

The acts or omissions of Kathryn Barker which may indicate that the existing parent-child
relationship is not a proper one and any excuse for the acts or omissions

 Kathryn stipulated that she (1) knowingly placed or knowingly allowed A.B. to remain in
conditions or surroundings which endangered the physical or emotional well-being of A.B. and (2) 
engaged in conduct or knowingly placed A.B. with persons who engaged in conduct which
endangered the physical or emotional well-being of A.B. On November 16, 2001, Kathryn left her
house at approximately 12:30 p.m. for a job interview and asked a neighbor, Summer Gibson
("Summer") to watch A.B. because Donald was not at home. After Kathryn left, Donald returned
to an empty house and surmised that either Kathryn or Summer took A.B. 

 About twenty minutes later, two friends of Donald's arrived with A.B., stating that A.B. had
been attacked by a pit bull mastiff dog. Donald took A.B. to the hospital, and A.B. was examined
by the hospital staff. According to Donald, members of the hospital staff stated that A.B.'s bites
appeared to be human, and informed Donald that they were going to call the sheriff's department.
Because Donald knew of a warrant for his arrest, he left the hospital with A.B., and returned to his
neighbor's house. 

 In the meantime, according to Kathryn, the person she was meeting for her interview never
arrived. Kathryn left, went shopping with a friend, and returned to her house after dark. She
discovered A.B. at the neighbor's house. Diesch received an intake call regarding A.B. and, after
locating him, he and Kathryn were taken to the hospital. According to Diesch's affidavit, Kathryn
was questioned about her activities during the day, A.B.'s caregiver, and Donald's location. Her
answers were inconsistent and evasive. Further, Kathryn's behavior was "bizarre," she admitted
using Valium and methamphetamine intravenously, and appeared intoxicated. Summer also arrived
at the hospital, was incoherent, and appeared intoxicated. Summer disputed that Kathryn had been
gone that afternoon. 

 A.B.'s injuries were more extensive than reported earlier. The intake report described a
human bite on his right shoulder blade, scratches on his back that were like human scratches, and
"pinch marks" on his ears. According to Diesch's affidavit, A.B. was covered with dried blood, had
numerous bruises, scratches and dig marks on his head. His ears were full of dried blood. His head
was dirty with crusty cradle-cap type spots on his head. In fact, Diesch described A.B. as "filthy,"
with clean hair but dirt so heavy behind his ears that no skin showed through in places. The bottoms
of his feet were black with dirt, and the condition of his feet and toes led Diesch to believe that he
did not wear shoes often. A.B. was dressed only in a pair of shorts. He had a Band-Aid on his right
eye, which was swollen, a large scratch covering his eyelid, and numerous cuts, digs, and scratches
on his face. Dark blood was pooled in the bottom of each ear, and both ears were scratched, bruised,
purple, and swollen. He had a number of scratches, digs, and emerging bruises on his back. Diesch
observed an "obviously" human bite below his right shoulder blade and what appeared to be a human
bite on the left shoulder blade. In her opinion, A.B.'s scratches did not appear to be made by a dog
because they were different lengths, depths, and did not have a pattern expected from a dog. In fact,
the scratches on his right shoulder blade seemed consistent with fingernail scratches, wide and deep. 

 A.B. told Smith that both Kathryn and Donald hurt him, and that Donald sexually abused
him. Although the foster parent journals reported allegations by A.B. that Donald and Kathryn
abused him, A.B. made similar allegations to Connell against his foster parents. Connell found
A.B.'s reliability as a reporter suspect because his perception had been influenced by what people
want to hear, his reports changed over time, and he had been asked numerous times "what Kathryn
and Donald did to him." Connell also contended there could be room for subjective interpretation
of Smith's notes suggesting physical and sexual abuse. Zimmerman had no independent evidence
or documentation of abuse other than what the foster parents and therapist told her.

 Additional evidence relating to the best interest of the child

 Smith does not believe it is in A.B.'s best interest to be returned to Kathryn based upon the
extreme nature of A.B.'s behavior, his history of violence, aggression, sexual acting out, anxiety and
fearfulness, and verbalizations that he had been harmed by Kathryn and Donald. According to
Zimmerman, A.B.'s therapist does not recommend placement in Kathryn's home. Further, Kathryn's
counselor did not recommend home placement because the trauma to A.B. was too significant. The
Department recommended termination of Kathryn's parental rights. Zimmerman stated that it is in
A.B.'s best interest to be adopted. Sussen also recommended termination of Kathryn's parental
rights and adoption. 

 Harper was unable to state with certainty what caused A.B. to become a vulnerable, damaged
child. She agreed that being attacked by a dog would be a traumatic event, and that, in most cases,
being removed from their home is a traumatic event for children. A.B. was placed in three foster
homes within five months, which could have damaged him. Smith has never talked to Kathryn or
to any other relatives, friends or neighbors who knew about A.B. before his removal by CPS. She
does not always believe that a child of three or four is a reliable reporter.

 Connell does not believe it is in the best interest of A.B. to terminate Kathryn's parental
rights because his attachment to his mother is solid and he will be traumatized by that loss. Further,
A.B. may be at risk for broken placements if Kathryn's rights are terminated. She believes A.B.
should be returned to his mother. 

 Based upon our review of the record and our application of the appropriate standard of
review, we conclude that evidence is sufficiently clear and convincing that a reasonable trier of fact
could have formed a firm belief or conviction that termination of Kathryn's parental rights is in
A.B.'s best interest. We also conclude that, although there is some disputed evidence, this evidence
is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor
of its finding and formed a firm belief or conviction that termination of Kathryn's parental rights is
in A.B.'s best interest. Consequently, we hold that the evidence is both legally and factually
sufficient to support the trial court's finding. Appellant's first issue is overruled.


Burden of Proof

 In her second issue, Kathryn contends that the trial court abused its discretion by placing the
burden of proof on her to prove that it is in A.B.'s best interest to be returned to her, not upon the
Department to prove that termination is in the best interest of A.B. Moreover, Kathryn argues that
she is entitled to a presumption that it is in the best interests of children to remain with their parents.
The Department contends that the trial court held the Department to its burden of proof.

 The burden of proof in a termination case is upon the person seeking to deprive the parent
of her parental rights. In re J.M.T., 39 S.W.3d at 240. There is a strong presumption that the best
interest of the child is served by preserving the parent-child relationship. Wiley, 543 S.W.2d at 352;
In re J.M.T., 39 S.W.3d at 240. It is the Department's burden to rebut this presumption. In re
K.C.M., 4 S.W.3d 392, 395 (Tex. App.-Houston [1st Dist.] 1999, pet. denied), disapproved on other
grounds, 89 S.W.3d 17, 26 (Tex. 2002). 

 At trial, the judge stated that his focus was on the best interest of A.B. and whether the child
would be further traumatized by returning him to Kathryn. Further, the trial court specifically stated
that he gave Kathryn the "benefit of the doubt" that she had changed and offered the child a good
environment. The trial judge assumed that Kathryn was a redeemed and capable parent. Because
the judge focused on the best interest of A.B. and presumed Kathryn to be a capable parent, the trial
court did not shift the burden of proof from the Department to Kathryn. See In re J.M.T., 39 S.W.3d
at 240. Kathryn's second issue is overruled.


Testimony about Adoption

 In her third issue, Kathryn argues that it was an abuse of discretion for the trial court to allow
A.B.'s foster mother to testify about her willingness to adopt the child and to allow other witnesses
to testify about A.B.'s possible adoption. The Department disagrees and contends that evidence of
adoption or placement plans are relevant to a best interest determination. Evidence of placement
plans and adoption is relevant to best interest. In re C.H., 89 S.W.3d at 28. Kathryn's third issue
is overruled.


Impartiality of Trial Judge

 In her fourth issue, Kathryn contends that she was denied due process and due course of law
under the Texas Constitution and the United States Constitution because the trial judge was unfair,
partial, and biased. The Department argues that there is no evidence in the record contrary to the
presumption that the trial judge was a neutral and detached officer of the court.

 Due process requires a neutral and detached hearing body or officer. Earley v. State, 855
S.W.2d 260, 262 (Tex. App.-Corpus Christi 1993), writ dism'd, improvidently granted, 872 S.W.2d
758 (Tex. Crim. App. 1994) (citing Gagnon v. Scarpelli, 411 U.S. 778, 786, 93 S. Ct. 1756, 1761,
36 L. Ed. 2d 656 (1973)). In the absence of a clear showing to the contrary, we will presume the trial
judge was a neutral and detached officer. Id. (citing Fielding v. State, 719 S.W.2d 361, 366 (Tex.
App.-Dallas 1986, pet. ref'd)). 

 At the beginning of trial, the trial judge assumed that Kathryn had redeemed herself, and gave
her the "benefit of the doubt" that she had changed and offered the child a good environment. The
trial judge specifically stated that the court was not there to punish Kathryn for her past behavior or
to reward her for her good behavior. However, when the trial judge questioned Flynn and Connell,
he referred to Kathryn's past history of drug abuse, her features of antisocial personality disorder,
and her relationships with men who were drug users with criminal histories. The trial judge
mentioned these aspects of Kathryn's character or actions in determining whether either expert could
give him an opinion on the risk of instability Kathryn posed to her child. Far from exhibiting bias
against Kathryn, the trial judge unequivocally stated that she was a redeemed parent and that his sole
focus was on the best interest of the child. Because Kathryn has failed to make a clear showing to
the contrary, she has failed to rebut the presumption that the trial judge was a neutral and detached
officer. Id. Accordingly, Kathryn's fourth issue is overruled.


Conclusion

 Based upon our review of the record, we conclude that the trial court did not err in finding
that terminating Kathryn's parental rights is in the best interest of A.B. Further, the trial court did
not improperly shift the burden of proof at trial and did not abuse its discretion by admitting the
testimony regarding adoption plans. Finally, Kathryn did not rebut the presumption that the trial
court was a neutral and detached officer. Therefore, the judgment of the trial court is affirmed.


 DIANE DEVASTO 

 Justice


Opinion delivered February 27, 2004.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.


(PUBLISH)